United States District Court
Southern District of Texas
**ENTERED**
June 15, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARMAINE McWILLIAMS, *et al*, Plaintiffs, | § § § § § | CIVIL ACTION NO. 4:17-cv-00345 |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| CITY OF HOUSTON, *et al*, Defendants. | § § § | |

OPINION AND ORDER
GRANTING MOTIONS TO DISMISS

Robert Stephen Jr died while in custody at the Houston Central Jail. Charmaine McWilliams is his mother. She and several other family members sued the City of Houston and a number of its employees involved in Stephen's arrest and detention, asserting claims for state-law negligence and constitutional violation of his civil rights.

The circumstances of Stephen's death are quite unfortunate. But the law doesn't here place the blame on the individual Defendants and the City. Their motions to dismiss must be granted. Dkts 54, 55.

1. Background

The operative pleading is Plaintiffs' fourth amended complaint. All allegations in it are accepted as true at this stage. *Walker v Beaumont Independent School District*, 938 F3d 724, 735 (5th Cir 2019), citing *Campbell v Wells Fargo Bank*, 781 F2d 440, 442 (5th Cir 1986).

a. Alleged actions and inaction

The Houston Police Department received a call reporting suspicious behavior in the early morning hours of December 27, 2015. Defendant Gabrielle Alston is the HPD officer who

responded to the scene. Dkt 53 at ¶¶ 1.10, 4.3. She encountered Stephen, observed that he was "highly intoxicated," arrested him for public intoxication, and took him to the Houston Central Jail for processing and detention. Id at ¶¶ 4.3–4.4. Plaintiffs allege that Alston failed to transport Stephen first "to a medical facility for any detoxification" and failed to inform HCJ personnel of his "highly visible intoxicated state." Id at ¶ 4.4.

Defendant Raul Sardinas was the on-duty medical screener at intake. Id at ¶ 1.7. Defendants Idelbio Perez-Gonzalez, Lourdes Torres Ahmed, and Ntum Aza Altorshan work at the HCJ as medical specialists and assisted Sardinas at intake. Id at ¶¶ 1.6, 1.8, 1.9. These four together are referred to as *the HCJ Defendants*. None are alleged to be medical doctors, and Plaintiffs' briefing confirms that they weren't. Dkt 54 at 17.

Sardinas interviewed Stephen, who "complied with the requests" made "during the screening and evaluation of him." Plaintiffs allege that Sardinas failed to have Stephen "treated by any medical personnel or provided any medication" to detoxify him before placing him in a holding cell. Dkt 53 at ¶ 4.8.

Perez-Gonzalez, Ahmed, and Altorshan observed that Stephen was "clearly in an intoxicated and incoherent state" and "unable to stand up on his own." After Stephen "passed out" and fell to the ground, they "made their initial checks on him." They then eventually "dragged" Stephen to place him in a holding cell. Plaintiffs allege that the HCJ Defendants "failed to seek medical assistance after observing" that Stephen was passed out and failed to have Stephen treated by medical personnel or provided medication towards detoxification. Id at ¶ 4.9.

About an hour and fifteen minutes later, Perez-Gonzalez was sent upon request (without specification by whom) to examine Stephen and "see why" he was unable to walk. "For unknown reasons, Perez-Gonzalez was unable to check vital signs or conduct a full physical examination, as specified in his job duties." And so, Plaintiffs allege, Perez-Gonzalez failed to "provide any medical attention" or have Stephen "treated by any medical personnel," and failed to provide any medication towards detoxification. Id at ¶ 4.10.

2

Stephen was ultimately placed alone in a holding cell for the duration of the early morning hours. Id at ¶¶ 4.15, 4.22. An officer notified Altorshan of "a medical emergency" requiring attention about seven hours after he was first placed in his cell. Id at ¶ 4.23. Altorshan and Ahmed found Stephen unresponsive on the floor of his cell. They checked his vital signs, determined that he wasn't breathing and had no pulse, and "proceeded to conduct CPR and use a defibrillator until the Houston Fire Department arrived to take over." Id at ¶¶ 4.23–4.24. These efforts were unsuccessful, and Stephen was pronounced dead. Id at ¶ 4.31. Plaintiffs allege in this regard that the HCJ Defendants failed to render timely aid to Stephen or provide him with medical treatment after he became nonresponsive. Id at ¶ 4.25. They also allege that the HCJ Defendants failed to seek medical treatment, to timely and appropriately administer CPR, or to timely request or transport him for "life-saving medical treatment." Id at ¶¶ 4.26–30.

The City and the individual Defendants note in their motions to dismiss that the underlying cause of death was an overdose from ingesting cocaine. Dkt 54 at 18 n 2; Dkt 55 at 10 n 1. Plaintiffs confirmed this fact at hearing on the motions.

### b. Alleged policies

Allegations as to pertinent HCJ and other municipal policies are muddled and scattered throughout the complaint. They could certainly be pleaded with better linkage to allegations of deficient conduct but can be generally understood. Curiously, some policies are specified but then paired with indication that the policy was followed, making it quite unclear what Plaintiffs meant by such pleading.

For example, Plaintiffs allege that HCJ policy required the HCJ Defendants to search arrestees on intake for weapons, illicit drugs, or contraband. Id at ¶ 4.6. But they note that such search was made of Stephen, and no weapons, illicit drugs, or contraband were found. Id at ¶ 4.7.

Plaintiffs also allege that HCJ policy required the HCJ Defendants "to screen and evaluate the health status of persons placed in custody." Id at ¶ 4.13. They assert generally that the HCJ Defendants failed to "conduct the *required* face-to-face

3

inspections." Id at ¶ 4.16 (emphasis original). But as noted above, Plaintiffs also allege that Sardinas "interviewed" Stephen upon intake for screening and evaluation, who "complied with the requests." Id at ¶ 4.8. Plaintiffs likewise allege that Perez-Gonzalez, Ahmed, and Altorshan also "made their initial checks" on Stephen. Id at ¶ 4.9. On the other hand, they allege that Perez-Gonzalez was unable to check vital signs and thus didn't conduct a full physical examination when examining Stephen a bit over an hour after intake. Id at ¶ 4.10.

Plaintiffs further allege that HCJ policy required the HCJ Defendants "to physically and visually check on inmates every thirty (30) minutes." Id at ¶ 4.15. They squarely assert that the HCJ Defendants failed to check on Stephen with that frequency. Id at ¶¶ 4.16, 4.20.

And Plaintiffs allege that the Texas Administrative Code required the City to have procedures in place for suicide screening and prevention. Id at ¶ 5.1, citing 37 Tex Admin Code pt 9 (Texas Commission on Jail Standards). But they allege that "a suicide assessment was performed" on Stephen in accord with this policy, without otherwise asserting that he committed or attempted suicide. Id at ¶ 4.18.

### c.   Causes of action

Plaintiffs bring twelve causes of action across three categories of claims. See Dkt 53 at ¶¶ 6.1–7.43. *First,* they bring a negligence claim under the Texas Tort Claims Act against each individual Defendant and against the City. *Second,* they bring a constitutional claim under 42 USC § 1983 against each individual Defendant for alleged violation of Stephen's right to reasonable medical care under the Eighth and Fourteenth Amendments. *Third,* they bring a claim for municipal liability under 42 USC § 1983 against the City for its alleged failure to train the individual Defendants and its ratification of their actions.

Plaintiffs filed action in February 2017, and the complaint was originally assigned to Judge Lynn Hughes. Dkt 1. They have since amended four times. The first amendment was by right under Rule 15(a). See Dkt 3. The second corrected a mistake relating to the representative capacity of Charmaine McWilliams. See Dkts 5, 7. The third added several defendants and pertinent

facts. See Dkt 25. Defendants moved to dismiss that complaint, asserting there the same arguments sponsored now. See Dkts 31, 35, 36. The action was then transferred to this Court in October 2019. Dkt 47. Plaintiffs requested and received leave to meet the then-pending motion to dismiss with "a further and final amended complaint." Minute Entry of 02/25/2020.

The operative pleading here is thus Plaintiffs' fourth amended complaint. Dkt 53. The individual Defendants and the City filed motions to dismiss under Rule 12(b)(6). Dkts 54, 55.

### 2.   Legal standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted."

Read together, the Supreme Court has held that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v Taylor*, 503 F3d 397, 401 (5th Cir 2007), quoting *Twombly*, 550 US at 555.

A complaint must therefore contain enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 US at 570. A claim has *facial plausibility* "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 US at 678, quoting *Twombly*, 550 US at 556.

Review on motion to dismiss under Rule 12(b)(6) is constrained. The reviewing court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker*, 938 F3d at 735 (citations omitted). It must also

accept all inferences that plausibly follow from those specific allegations. *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. And it must generally limit itself to the contents of the complaint and its attachments. *Brand Coupon Network LLC v Catalina Marketing Corp*, 748 F3d 631, 635 (5th Cir 2014), citing *Collins v Morgan Stanley Dean Witter*, 224 F3d 496, 498 (5th Cir 2000).

### 3. Consideration of jailhouse video

Ten segments of digital video exist of the events at different locations inside the HCJ during Stephen's processing and detention. These aren't specifically referenced in the fourth amended complaint. Even so, Plaintiffs attached them with a docket entry following their responses to the subject motions. See Docket Entry of 06/25/2020. They argued at hearing that the video should be reviewed on consideration of the motions. Defendants disagreed.

As just noted, review on motion to dismiss is typically limited to the complaint and its attachments. But a notable exception permits consideration of documents or other undisputed materials "if they are referred to in the plaintiff's complaint and are central to her claim." *Collins,* 224 F3d at 498–99, quoting *Venture Associates Corp v Zenith Data Systems Corp,* 987 F2d 429, 431 (7th Cir 1993). The Fifth Circuit has characterized this as a "limited exception." *Scanlan v Texas A&M University*, 343 F3d 533, 536 (5th Cir 2003), citing *Collins*, 224 F3d at 498. But it has expressly recognized that a district court may consider pertinent video (like that from an officer's body camera or a jail hallway camera) if the requirements stated above are satisfied. For example, see *Robles v Ciarletta*, 797 F Appx 821, 831–32 (5th Cir 2019, *per curiam*). This is so because review of such evidence, where appropriate, can assist the court "in making the elementary determination of whether a claim has been stated." *Collins,* 224 F3d at 499.

It would have been far better practice for the fourth amended complaint to have simply and specifically cited the video segments. But several reasons counsel in favor of their discretionary consideration now. First, the video is quite obviously central to the asserted claims. Indeed, it without question is the source of the detailed allegation of relevant events

within the HCJ. Second, there's no dispute that the City produced the segments to Plaintiffs in April 2017 after the filing of the second amended complaint. See Dkt 62. Third, there's no contention that the segments are incomplete or anything other than an accurate depiction of the central events. Compare *Taylor v Hartley*, 488 F Supp 3d 517, 526 (SD Tex 2020) (refusing to consider proffer of select screenshots without submission of entire videotape). And fourth, dismissal without their consideration would likely warrant repleading in this regard, which would serve only to make such citation explicit.

And so the segments have been reviewed. The longest is just over nine hours and thirty minutes in length (Video 9), being a camera from outside Stephen's holding cell that shows his entire time within it. Another is of similar length (Video 10), being a related camera that shows the comings and goings of HCJ personnel in the hallway outside the cell. Another two are approximately four minutes in length (Videos 3 and 4), being two cameras at each end of the room for the initial check and screening of Stephen. The other six segments are relatively brief (Videos 1, 2, 5, 6, 7, and 8), being cameras that show the movement of Stephen between locations within the HCJ.

The segments appear to account for the entirety of Stephen's time within the HCJ. There's no audio component. And the timestamps don't correspond to actual time of day because each segment starts at 00:00:00. And so, for instance, timestamp 00:00:00 on Video 3 corresponds to roughly 2:30 am, the time of Stephen's processing at intake. And timestamp 00:00:00 on Videos 9 and 10 corresponds to roughly 2:45 am, the time at which Stephen was first placed in his cell. For clarity, citation hereafter is made solely to the timestamp on the videos.

As vividly described in the pleadings, Stephen does appear extremely unbalanced with difficulty standing, slow to respond, and (at times) lacking in motor skills. But the video also shows that he was able to respond and communicate to HCJ personnel as they processed him, including as he lay on the floor when he had difficulty standing. See generally Videos 3 and 4. And after being taken to a holding cell, he was able to communicate with staff while also sleeping, drinking, and moving about at certain

intervals over the ensuing hours. For example, see Video 9 at 00:19:45, 00:55:23, 01:27:25, 02:03:30, 03:50:20 (talking); 00:04:22, 00:23:45, 01:54:50 (drinking fluids provided); 00:24:05, 01:53:14, 02:39:10, 03:13:30 (sitting upright); 02:47:20, 04:19:27 (drinking at sink).

The segments also generally show that HCJ personnel viewed Stephen in his cell more than forty times during the six-and-a-half hours that he was detained there prior to his death. See Videos 9 (cell) and 10 (hallway). Such views mainly consist of officers walking by the cell with Stephen plainly visible in it (and then back by on return). But others consist of them pausing to talk or interact with him. These conclude with a visual check at timestamp 06:10:31, about three minutes before he rolled from his bunk onto the floor. He would have then been observed in this state in several ensuing walk-bys and checks over a short period of time. See Video 10 at 06:15:48, 06:34:48, 06:39:25, 06:47:54; see also Video 9 at 06:39:50. Officers then entered the cell, with robust but ultimately unsuccessful efforts at CPR and defibrillation ensuing for at least nine minutes. See Video 9 at 06:49:03.

These segments on the whole don't depict the allegations any better than the typical standard—being that well-pleaded facts must be assumed true and viewed in their most favorable light, including reasonable inferences. *Walker*, 938 F3d at 735, citing *Campbell*, 781 2d at 442. This isn't surprising because, again, the description of events comes directly from the video segments.

As such, further reference will be to events as most favorably described in the fourth amended complaint—subject to one exception. Any allegation contradicted by a video segment will be disregarded. A court isn't required to (and indeed, shouldn't) accept as true allegations that are contradicted by the materials attached to the complaint or otherwise appropriate for judicial consideration. For example, see *Cicalese v University of Texas Medical Branch*, 456 F Supp 3d 859, 872 (SD Tex 2020), citing *R2 Investments LDC v Phillips*, 401 F3d 638, 642 (5th Cir 2005).

### 4.   Analysis

The motions to dismiss attack all three categories of claims asserted by Plaintiffs.

### a.   State-law negligence claims

Plaintiffs bring claims for negligence under the Texas Tort Claims Act against the individual Defendants and the City.

*As to the individual Defendants.* Section 101.106(a) of the Texas Civil Practice and Remedies Code provides that a plaintiff irrevocably waives further right to pursue tort claims against the employees of a governmental unit where action is also brought against the unit itself. See Dkt 54 at 11. Plaintiffs conceded this point at hearing. As such, these claims against the individual Defendants must be dismissed. See *Sweetin v Texas City*, 2020 WL 6130881, *2–3 (SD Tex).

*As to the City.* The Texas Tort Claims Act states that "a municipality is liable under this chapter for damages arising from its governmental functions." See Tex Civ Prac & Rem Code § 101.0215(a). It sets out a nonexhaustive list of defined *governmental functions*. Ibid. But it then provides a "limited waiver of sovereign immunity" for municipalities performing those functions in three types of circumstances. *Texas Department of Criminal Justice v Miller*, 51 SW3d 583, 587 (Tex 2001). These pertain to torts arising out of the use of motor-driven vehicles or equipment, the condition or use of personal property, or the condition or use of real property. Tex Civ Prac & Rem Code § 101.021; see also *City of Houston v Nicolai*, 539 SW3d 378, 386–88 (Tex App—Houston [1st Dist] 2017, no pet). While that may not be the most straightforward way to address the topic, Texas courts have interpreted all of this to mean that a municipality performing *governmental functions* is entitled to immunity *except* as specifically waived in the Texas Tort Claims Act. For example, see *City of Sugarland v Ballard*, 174 SW3d 259, 264 (Tex App—Houston [1st Dist] 2005, no pet) (citations omitted).

The negligence claims by Plaintiffs target conduct and action within the provision of police control and the operation of jails. Those are specifically deemed to be *governmental functions*. See Tex Civ Prac & Rem Code § 101.0215(a)(1), (a)(7). Plaintiffs' allegations don't concern any of the three circumstances subject to the waiver of sovereign immunity. This means that the City is immune from the asserted negligence claims. For example, see *Henderson v Iowa Colony*, 2016 WL 2586715, *2 (Tex App—

Houston [1st Dist], no pet); *Mitchell v Orange County*, 2009 WL 2617582, *3 (Tex App—Beaumont, pet dismd woj), cert denied, 562 US 860 (2010). As such, these claims against the City must be dismissed.

    b.  Section 1983 claims, individual Defendants

Plaintiffs bring constitutional claims under 42 USC § 1983 against Alston and the HCJ Defendants. The central concern is the constitutional right of pretrial detainees to reasonable care for their serious medical needs. See *Dyer v Houston*, 964 F3d 374, 380 (5th Cir 2020), citing *Thompson v Upshur County*, 245 F3d 447, 457 (5th Cir 2001). This right flows from "both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v City of Corinth*, 74 F3d 633, 639 (5th Cir 1996, *en banc*), citing *Bell v Wolfish*, 441 US 520 (1979). Plaintiffs also assert applicability of the Eighth Amendment. For example, see Dkt 53 at ¶ 4.35. But those rights pertain only to convicted prisoners. *Hare*, 74 F3d at 639, citing *Estelle v Gamble*, 429 US 97, 104 (1976).

Alston and the HCJ Defendants assert qualified immunity as a defense. This protects a government official if the conduct "either did not violate a federal right of the plaintiff or that right was not clearly established at the time of the relevant events." *Batyukova v Doege*, 994 F3d 717, 724 (5th Cir 2021), citing *Dyer*, 964 F3d at 380. The Fifth Circuit frames the analysis as follows:

> "To evaluate whether a government official is entitled to qualified immunity, we conduct a two-prong inquiry: we ask (1) whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v Ellington*, 800 F3d 154, 169 (5th Cir 2015), quoting *Thompson*, 245 F3d at 457. "We have discretion to address either prong first without necessarily addressing the other." *Carroll*, 800 F3d at 169.

*Harmon v Dallas County*, 927 F3d 884, 892 (5th Cir 2019, *per curiam*) (citation form altered).

As to the availability of qualified immunity generally, the Fifth Circuit explains:

> The precise question we must answer is "whether a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law and the information the officer[ ] possessed." *Keller v Fleming*, 952 F3d 216, 225 (5th Cir 2020), quoting *Anderson v Creighton*, 483 US 635, 641, (1987) (cleaned up). "[W]e must frame the [clearly established law question] with specificity and granularity," *Morrow v Meachum*, 917 F3d 870, 874–75 (5th Cir 2019), for "[t]he dispositive question is whether the violative nature of particular conduct is clearly established." Id, quoting *Mullenix v Luna*, 577 US 7, 12 (2015, *per curiam*). The plaintiff must identify controlling precedent that makes the unlawfulness of the officer's conduct sufficiently clear that a reasonable officer would have understood his conduct violated that right. *Keller*, 952 F3d at 225, citing *Reichle v Howards*, 566 US 658, 664 (2012).

*Brown v Tarrant County*, 985 F3d 489, 495 (5th Cir 2021) (citation form altered).

### i.    Officer Gabrielle Alston

Plaintiffs allege that Alston's "acts and/or omissions constitute deliberate indifference to Decedent's medical needs, was unreasonable and violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution." Dkt 53 at ¶¶ 7.4–7.5. They assert two failures on her part—to transport Stephen first "to a medical facility for any detoxification," and to inform HCJ personnel of his "highly visible intoxicated state." Id at ¶ 4.4.

Allegation as to the latter is certainly deficient. The complaint alleges that Alston arrested Stephen, "charging him with public intoxication." Id at ¶ 4.3. To be booked on such charge

11

necessarily means that Stephen's intoxicated condition was in fact disclosed at the HCJ. And the repeated allegation throughout the fourth amended complaint is that Stephen's state of intoxication was *highly visible* and *obvious*. For example, see id at ¶¶ 4.4, 4.9, 4.10, 6.44, 7.17. Plaintiffs sponsor nothing to establish that a prison officer has a constitutional obligation to inform her fellow officers of known or obvious medical conditions. Compare *Hyatt v Thomas*, 843 F3d 172, 176–78 (5th Cir 2016) (no constitutional violation where jail officer informed her shift relief of plaintiff's nonobvious conditions). And certainly, nothing suggests a clearly established right in that regard.

As to the more generalized assertion of deliberate indifference, it is resolved on the same basis as the HCJ Defendants, discussed next. That is, Plaintiffs establish neither any violation of a constitutional right as to a failure to diagnose or monitor Stephen, nor any violation of a clearly established right in that regard.

The Section 1983 claim against Alston must be dismissed.

### ii.   The HCJ Defendants

Plaintiffs assert that "acts and/or omissions" of each of the HCJ Defendants "constitute deliberate indifference to Decedent's medical needs." Dkt 53 at ¶¶ 6.4 (as to Perez-Gonzalez), 6.29 (as to Sardinas), 6.54 (as to Ahmed), 6.79 (as to Altorshan). None of the alleged acts or omissions are specified in any way in these counts, leaving it to review of the generalized factual allegations that precede them. And the undifferentiated mixture presented there makes it difficult to discern connections.

Consideration here starts with several more attenuated allegations before addressing the central contention that the HCJ Defendants violated Stephen's constitutional right as a pretrial detainee to reasonable care for his serious medical needs.

### A.   Attenuated allegations

Plaintiffs reference HCJ policies as to searches for weapons and drugs, initial screening upon intake, and suicide assessment. Dkt 53 at ¶¶ 4.6, 4.13, 5.1. But they nowhere specify the extent to which such policies are required to implement federal guarantees of right. It is also quite unclear whether Plaintiffs even

intend to assert claims on these bases. This is because other allegations specifically concede compliance with those self-same policies. Id at ¶¶ 4.7–4.9, 4.18. As such, to the extent asserted, any such claims must be dismissed.

Plaintiffs also allege that the HCJ Defendants "used excessive force" on Stephen while he "was alone in his cell," "inflicting bruises and abrasions to his head, hand, abdomen and legs." Id at ¶ 4.19. They don't say how this was done, don't allege who did it, and don't return to it when pleading their causes of action. Such conclusory allegation can't overcome a defense of qualified immunity. See *Arnold v Williams*, 979 F3d 262, 267 (5th Cir 2020), citing *Backe v LeBlanc*, 691 F3d 645, 648 (5th Cir 2012). And in any event, the video segments submitted by Plaintiffs for review entirely contradict the assertion. Quite simply, no such conduct is recorded during Stephen's time in his cell or elsewhere in the HCJ. To the extent asserted, any claim in this regard must also be dismissed.

Another attenuated allegation states that the HCJ Defendants allowed Stephen to "fall to the ground" and "remain face down on the floor," after which they "repulsively and inhumanely dragged" him across the floor to his cell. See Dkt 53 at ¶ 4.9. Like the above reference to excessive force, Plaintiffs don't attempt to connect this in their counts to any stand-alone assertion of violation of constitutional right. As such, it is best understood as indicating that the HCJ Defendants were on notice of Stephen's acute intoxication, from which Plaintiffs would deduce deliberate indifference. And in that regard, the video segments submitted by Plaintiffs do support their assertion that Stephen was unable to stand, eventually losing his balance and needing help. See Videos 3 and 4. But beyond this, the more extreme characterization of the allegation cannot be accepted. This is because the video segments show that the officers generally took care to otherwise support Stephen and guard against injury. That is, they lowered him to the ground without incident, placed him on his side, searched him, and conversed at times with him. The videos also show from several angles that after the officers hauled Stephen across a smooth floor to his cell, he was placed without incident onto a bunk and provided liquids

to drink. See Videos 5 through 9. And Plaintiffs don't allege injury from this conduct alone, with none apparent in the video. To the extent that they intend this to assert a claim, it must be dismissed.

B. Failure to diagnose, to monitor, and to render emergency aid

The central allegations by Plaintiffs concern an asserted failure by the HCJ Defendants to properly diagnose Stephen, to properly monitor him in his cell, and to render timely and effective emergency aid once it was determined that he needed it. These are factually distinct. But the same law addresses them all.

The standard for analyzing an alleged violation of the pretrial right to medical attention depends upon whether the challenged conduct involves an "episodic act or omission" or a "condition of confinement." *Tamez v Manthey*, 589 F3d 764, 769 (5th Cir 2009, *per curiam*), quoting *Scott v Moore*, 114 F3d 51, 53 (5th Cir 1997, *en banc*); see also *Hare*, 74 F3d at 644–45. This is plainly an episodic-act case, being one where "the complained-of harm is a particular act or omission of one or more officials." *Tamez*, 589 F3d at 769, quoting *Scott*, 114 F3d at 53. For example, the Fifth Circuit in *Olabisiomotosho v City of Houston* found such analysis applied to an alleged failure by the officer "to take better care of" an inmate and "to medically screen her and secure her to treatment." 185 F3d 521, 526 (5th Cir 1999).

To defeat qualified immunity in an episodic-acts case, the plaintiff must "prove the official 'acted or failed to act with deliberate indifference to the detainee's needs.'" *Brown v Bolin*, 500 F Appx 309, 314 (5th Cir 2012), quoting *Hare*, 74 F3d at 648. To establish *deliberate indifference* in this context requires the plaintiff to "establish that the official knew of and disregarded an excessive risk of inmate health or safety." *Brown*, 500 F Appx at 314, citing *Farmer v Brennan*, 511 US 825, 837 (1994). This is an "extremely high standard." *Domino v Texas Department of Criminal Justice*, 239 F3d 752, 756 (5th Cir 2001), citing *Johnson v Treen*, 759 F2d 1236, 1238 (5th Cir 1985). The Fifth Circuit holds, "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brown*, 500 F Appx at 314, quoting *Farmer*, 511 US at 837. It also recently observed in *Dyer*

14

that some panels have articulated a further requirement that the official subjectively intend that harm occur. 964 F3d at 380, 383–84 (collecting cases). That needn't be addressed here because the traditional two-part inquiry disposes of the issue. See ibid.

*As to failure to diagnose.* Plaintiffs allege that the HCJ Defendants should have recognized that Stephen needed urgent medical attention and provided it, but that they failed to do so. Dkt 53 at ¶¶ 4.10–11. It is well established on this point that a passive failure to identify a serious medical need doesn't constitute deliberate indifference. *Trevino v Hinz*, 751 F Appx 551, 555 (5th Cir 2018, *per curiam*). Indeed, the Fifth Circuit is adamant that this means that "negligence or even grossly negligent conduct" doesn't suffice. Id at 554, citing *Thompson*, 245 F3d at 458–59, in turn citing *Hare*, 74 F3d at 645, 649. "A gross error is still only an error, and an error is not an abuse of power. Because an error by a government official is not unconstitutional, 'it follows that gross negligence is not a sufficient basis for liability.'" *Hare*, 74 F3d at 645, quoting *Salazar v City of Chicago*, 940 F2d 233, 238 (7th Cir 1991) (further citation omitted). Instead, only if it's shown that the defendants "failed to act when they were either aware or should have been aware, because it was so obvious, of an unjustifiably high risk" of serious medical injury can it be said that they acted with deliberate indifference. *Tamez*, 589 F3d at 770 (internal quotations omitted); see also *Sibley v Lemaire*, 184 F3d 481, 489–90 (5th Cir 1999).

Fifth Circuit decisions on starkly similar fact patterns entitle the HCJ Defendants to qualified immunity on this aspect of Plaintiffs' claims. In *Tamez v Manthey*, police arrested the decedent for evading arrest following his running a stop sign at high speed. 589 F3d 764, 766 (5th Cir 2009, *per curiam*). His behavior was described as aggressive and combative, and the on-duty nurse observed that his eyes were fully dilated. The medical staff determined that his condition didn't present an emergency and kept him in city jail overnight, checking on him regularly. The police transferred him to a hospital for further evaluation in the morning, where he experienced several seizures and died. It was later determined that he had recently ingested a large amount of cocaine. Id at 766–68. Even so, the Fifth Circuit found no

constitutional violation. Noticing the pupil dilation and other symptoms, it said, didn't mean that the defendants ignored a substantial risk to the decedent's health. Rather, the police expressly determined (albeit incorrectly) that his health didn't require immediate attention. Id at 770–72.

Likewise is *Estate of Allison v Wansley*, 524 F Appx 963 (5th Cir 2013, *per curiam*). Police there arrested the decedent and placed her in county jail. They observed that she seemed very intoxicated because she was unbalanced and slurred her speech. The jail staff checked on her regularly, and she fell asleep without incident. She then died of ethanol poisoning later that night. Id at 965–68. The Fifth Circuit held that the decision to place her in the holding cell and check on her regularly was objectively reasonable. Id at 972.

*Tamez* most directly addressed the *constitutional-violation* inquiry on qualified immunity. *Estate of Allison* most directly addressed the *clearly-established* inquiry. But the Fifth Circuit has said that both inform what it means for police conduct to be objectively reasonable in the context of providing medical care to detainees. See *Trevino*, 751 F Appx at 555–56, citing *Tamez*, 589 F3d at 764, and *Estate of Allison*, 524 F Appx at 972. It is thus settled law in the Fifth Circuit that jail personnel don't act with *deliberate indifference* when they place a visibly intoxicated detainee in a holding cell rather than take him to the hospital—provided that regular supervision occurs. *Estate of Allison*, 524 F Appx at 972–73. The Fifth Circuit flatly holds that, absent clear "external manifestations of medical distress," the Fourteenth Amendment doesn't mandate that "officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers." Ibid, quoting *Grayson v Peed*, 195 F3d 692, 696 (4th Cir 1999). The conclusion is the same even where a detainee exhibits ambiguous symptoms. *Estate of Allison*, 524 F Appx at 972.

Plaintiffs allege throughout only variations on the allegation that Stephen appeared to be heavily intoxicated, as he was incoherent and unable to stand. For example, see Dkt 53 at ¶¶ 4.3, 4.4, 4.9, 4.10, 6.20, 6.21, 7.17, 7.21. Plaintiffs' counsel confirmed at hearing that Stephen was ultimately determined to have died from ingesting large quantities cocaine. See also Dkt 54

at 18 n 2; Dkt 55 at 10 n 1. But there's no allegation that he informed anyone of such ingestion, that he was in observable medical distress because of it, or that the HCJ Defendants were affirmatively aware that Stephen was at some point suffering from cocaine toxicity.

Instead, the amended complaint squarely asserts that Sardinas did in fact conduct an initial medical-screening interview with which Stephen complied, and that the other HCJ Defendants also "made their initial checks" on him. Dkt 53 at ¶¶ 4.8, 4.9. Plaintiffs also acknowledge that Perez-Gonzalez examined him again after he was placed in his cell. Id at ¶ 4.10. True, they assert that this medical check was somehow insufficient. Ibid. But that isn't the legal standard. "Even if those steps were 'ineffectual,' they do not demonstrate deliberate indifference." *Estate of Allison*, 524 F Appx at 971–72, quoting *Southard v Texas Board of Criminal Justice*, 114 F3d 539, 554 (5th Cir 1997). And the video segments make clear that this in-person medical inspection included cooperative conversation, the provision of fluids, and a check of his pulse and pupils. See Video 9 at 00:19:33 to 00:26:10; see also id at 00:55:18 to 00:56:20 (further conversation and observation).

At most, Plaintiffs allege a passive failure to identify a serious medical need. But "negligence or even grossly negligent conduct" in this regard doesn't suffice to establish deliberate indifference. *Trevino*, 751 F Appx at 554; see also *Dyer*, 964 F3d at 381. Absent any clear manifestation of medical distress, it can't be said that the HCJ Defendants were *deliberately indifferent* in their decision to let Stephen "sleep it off," provided that they check on him regularly. *Estate of Allison*, 524 F Appx at 972. But even were a violation of constitutional right found, Plaintiffs must still "identify controlling precedent that makes the unlawfulness of the officer's conduct sufficiently clear that a reasonable officer would have understood his conduct violated that right." *Brown*, 985 F3d at 495 (citations omitted). They fail to do this. Indeed, *Tamez* and *Estate of Allison* are settled law to the contrary.

This aspect of the Section 1983 claims against the HCJ Defendants must be dismissed.

17

*As to failure to monitor.* Plaintiffs allege that HCJ policies required monitoring "to physically and visually check on inmates every thirty (30) minutes" that (at least in some unquantified respect) must be "face-to-face inspections." See id at ¶¶ 4.15, 4.16, 4.20. And they allege that the checks by the HCJ Defendants weren't made according to those intervals or with the requisite in-person proximity. See id ¶¶ 4.16, 4.20. Plaintiffs argue that Stephen's condition was so obvious that it required in-person monitoring and, at least in part, that someone with medical training do the monitoring. Id at ¶¶ 4.9, 6.21, 7.27. That sort of monitoring, Plaintiffs also say, would have shown that Stephen needed urgent medical care. For example, see id at ¶ 4.21.

Fifth Circuit precedent does establish the general proposition that jail staff must monitor detainees suspected of being under the influence of drugs or alcohol. For example, see *Trevino*, 751 F Appx at 552–53; *Estate of Bonilla v Orange County*, 982 F3d 298, 308 (5th Cir 2020). That's because, absent such checks, it may be said that jail staff "should have been aware" of any external manifestations of distress that monitoring would have revealed. *Tamez*, 589 F3d at 770 (quotation omitted). And Fifth Circuit precedent likewise confirms that jail officers in similar circumstances generally must check on detainees every fifteen to thirty minutes. See *Estate of Allison*, 524 F Appx at 967, 972 (fifteen- to thirty-minute intervals); *Estate of Bonilla*, 982 F3d at 308 (same); *Trevino*, 751 F Appx at 552–53 (ten- to fifteen-minute intervals).

But Plaintiffs' broader contention as to the type and intensity of required monitoring is unfounded. They provide no citation indicating that walk-by checks are an impermissible means by which jail personnel may monitor a detainee thought to be under the influence of drugs or alcohol. To the contrary, the Fifth Circuit found no constitutional violation where jail staff conducted only walk-by checks in *Tamez* and *Estate of Allison*. See *Tamez*, 589 F3d at 771; *Estate of Allison*, 524 F Appx at 972. And the jail staff in those cases were ordinary officers, without even the specialized medical credentials alleged here as to the HCJ Defendants. Compare Dkt 53 at ¶¶ 1.6–1.9 (alleging as medical specialists and medical screeners), with *Tamez*, 589 F3d at 771

(involving ordinary detectives), and *Estate of Allison*, 524 F Appx at 967–68 (involving ordinary jailers). If anything, this means that the HCJ provided better monitoring practices than that found sufficient in those decisions. And in that light, it can in no way be said that it was clearly established under the law that something more was required.

This leaves Plaintiffs to contend (as they do) that the HCJ Defendants simply didn't monitor frequently enough. Dkt 53 at ¶¶ 4.15–4.16, 4.20. For their part, the HCJ Defendants appear to misconstrue the fourth amended complaint when arguing that Plaintiffs specifically concede that Stephen was checked at appropriate intervals. See Dkt 54 at 19, citing Dkt 53 at ¶ 4.15. The phrasing in the complaint is certainly inartful and at times elliptical. But Plaintiffs squarely allege elsewhere that the HCJ Defendants "failed to check on Decedent every fifteen (15) and/or thirty (30) minutes." Dkt 53 at ¶ 4.20; see also id at ¶ 4.16.

Even so, the problem with the argument remains its factual deficiency. Plaintiffs have urged consideration of the video segments, which recorded events in Stephen's cell and the hallway in front of it. See Videos 9 (cell) and 10 (hallway). The precise number of checks is perhaps difficult to discern because of the indirect angle of the hallway camera. But even if not exact, the segments show that HCJ personnel quite regularly checked on Stephen, viewing his cell at least forty times during the six-and-a-half hours that he was detained there prior to his death. Most of these generally consist of officers walking by the cell with Stephen plainly visible in it (and then back by on return). But others consist of them pausing to talk or interact with him. These walk-bys were quite frequent at first, ranging from nine to twelve per hour. That frequency tapered off through the predawn hours, while never appearing to fall below two checks per hour.

A court isn't required to accept as true allegations that are contradicted by pertinent evidence properly under consideration. See *Cicalese*, 456 F Supp 3d at 872, citing *R2 Investments*, 401 F3d at 642. Quite simply, Plaintiffs can't establish a constitutional violation in this regard for the very reason that the HCJ Defendants regularly monitored Stephen. This included five walk-bys or checks in the sixty minutes before CPR began. See

Video 10 at 06:10:31, 06:15:48, 06:34:48, 06:39:25, 06:47:54. This number of checks itself belies contention that the conduct of these officers was *deliberately* indifferent.

This aspect of the Section 1983 claims against the HCJ Defendants must also be dismissed.

*As to failure to render emergency aid.* Plaintiffs also allege that, after discovering Stephen unconscious on the floor of his cell, the HCJ Defendants failed to seek medical treatment, to timely and appropriately administer CPR, or to timely request or transport him for "life-saving medical treatment." Dkt 53 at ¶¶ 4.26–30. But video footage again contradicts the contention. It shows that CPR was robustly administered for nearly nine minutes, including defibrillation. See Video 9 at 06:49:55. And as to transportation to a hospital, Plaintiffs' other allegations note that when found, Stephen was "not breathing and had no pulse." Dkt 53 at ¶ 4.24; see also Dkt 57 at 11 (noting Stephen was "found dead in his cell"). This means that subsequent medical attention elsewhere wasn't possible or would have been ineffectual. But even assuming that any violation of right could be sufficiently pleaded in this regard, Plaintiffs haven't shown any clearly established right to something more than immediate administration of CPR—or that some other action was required once Stephen was found and pronounced dead. For comparison, see *Arenas v Calhoun*, 922 F3d 616, 619–20, 624–26 (5th Cir 2019) (no violation where jail staff performed CPR and attempted to resuscitate detainee, but detainee had already died).

The real concern here—as with the asserted failures to diagnose and to monitor—devolves back to the timing of identification that Stephen needed emergency medical attention. For example, the most troubling aspect of the video segments isn't even one specified in the fourth amended complaint. It concerns that final hour before CPR began on Stephen. There was a walk-by of Stephen's cell as he lay at rest on his bunk. See Videos 9 and 10 at 06:10:31. He then rolled from his bunk unconscious onto the floor about three minutes later. He was observed by officers in this state in several ensuing walk-bys and checks over a short period of time. See Video 10 at 06:15:48, 06:34:48, 06:39:25, 06:47:54. Only then did officers decide to

20

enter his cell, after which their vigorous CPR efforts began. See Video 9 at 06:49:03.

The failure to enter the cell sooner is concerning. But even assuming that the HCJ Defendants were negligent in this regard—or even grossly negligent—Fifth Circuit precedent entitles them to qualified immunity. For example, the detainee in *Estate of Allison* fell asleep in her cell after interacting with the jail staff at intake, with officers conducting visual checks every fifteen to thirty minutes. 524 F Appx at 967. At some point they noticed that she "had not changed positions in a while, and [they] could not tell whether she was breathing by looking into her cell." Ibid. The Fifth Circuit found that the delay didn't amount to deliberate indifference. "While the result here was tragic, we cannot say that all, or even most, reasonable officers would not have done the same, absent an inmate's additional external manifestations of medical distress." Id at 972–73. So, too, in *Trevino v Hinz*. The detainee there "vomited, had several shaking episodes, and told the officers she was sick." 751 F Appx 551, 556 (5th Cir 2018, *per curiam*). She later died of a seizure due to a cocaine overdose. But the officers had no knowledge of such ingestion, and so they weren't on notice to monitor for associated concerns. Ibid. The Fifth Circuit held that the officers were entitled to qualified immunity, finding that "an officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference." Id at 555.

The Fifth Circuit has held in many other contexts that conduct that could be second-guessed as negligence or gross negligence doesn't overcome an assertion of qualified immunity. For example, *Estate of Henson v Krajca*, 440 F Appx 341, 345–47 (5th Cir 2011) (deliberate indifference not shown where jail nurse may have been grossly negligent in failing to prevent detainee from dying of chronic obstructive pulmonary disease); *Sanchez v Young County*, 866 F3d 274, 280 (5th Cir 2017) (deliberate indifference not shown where jail employees may have been negligent or grossly negligent in failing to prevent suicide); *Leal v Wiles*, 734 F Appx, 905, 910–11 (5th Cir 2018, *per curiam*) (deliberate indifference not shown where jail employees may have been negligent in failing to protect detainee from being assaulted

by rival gang members); *Dyer*, 964 F3d at 380–81 (deliberate indifference not shown where paramedics may have been negligent in failing to take further steps to treat head injury and drug-induced behavior of arrestee). And at best, that's what Plaintiffs state here—allegations of negligence or gross negligence. But this doesn't establish the deliberate indifference necessary to state a constitutional violation.

The allegations in the fourth amended complaint don't overcome the assertion of qualified immunity by the HCJ Defendants. The claims in this regard must be dismissed.

c.   Section 1983 claims, City of Houston

Municipal liability under Section 1983 doesn't extend merely on a *respondeat superior* basis. *Monell v Department of Social Services of City of New York,* 436 US 658, 691 (1978). The plaintiff must show that an official policy promulgated by the municipal policymaker was the moving force behind the violation of a constitutional right. *Piotrowski v City of Houston*, 237 F3d 567, 578 (5th Cir 2001). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Doe v Edgewood Independent School District*, 964 F3d 351, 364–65 (5th Cir 2020) (emphasis in original), quoting *Pembaur v Cincinnati*, 475 US 469, 479 (1986).

Plaintiffs bring *Monell* claims under 42 USC § 1983 against the City, but without clear connection to the HCJ and municipal policies described above. And as already noted, their allegations establish that the HCJ Defendants did in fact comply with policies as to screening for weapons and drugs and as to assessment at intake as to physical condition and suicide risk.

What appears to remain are two liability theories. The first is allegation that the City failed to train its employees to adequately identify and treat the serious medical conditions of detainees. Dkt 53 at ¶¶ 5.1–5.4, 7.26–7.31. The other is allegation that the City ratified the conduct by the individual Defendants after learning of it. Id at ¶¶ 4.33, 7.27, 8.1.

i.    Failure-to-train theory

The Supreme Court observes, "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v Thompson*, 563 US 51, 61 (2011). But a decision by a local government not to train certain employees about their legal duty to avoid violating citizens' rights may in some circumstances rise to the level of an official government policy for purposes of Section 1983. Id at 61–62, citing *Board of County Commissioners of Bryan County Oklahoma v Brown*, 520 US 397, 407–10 (1997) (citations omitted).

To state such a claim, a plaintiff must plead that the training procedures of the municipality's policymaker were inadequate; the policymaker was deliberately indifferent in adopting the training policy; and the inadequate training policy directly caused the plaintiff's injury. *Conner v Travis County*, 209 F3d 794, 796 (5th Cir 2000), quoting *Baker v Putnal*, 75 F3d 190, 200 (5th Cir 1996). Plaintiffs fail to meet any of these elements.

*As to adequacy of training procedures.* Plaintiffs at base allege that the City failed to train jail staff to evaluate and treat detainees for serious medical needs. See Dkt 53 at ¶ 4.11. But municipal liability doesn't attach merely because "a particular officer may be unsatisfactorily trained" or "an otherwise sound program has occasionally been negligently administered." *City of Canton v Harris*, 489 US 378, 390–91 (1989). To meet the first element, the Fifth Circuit directs that the focus must be on the *adequacy* of the training program in relation to the tasks that the particular officer must perform. *Snyder v Trepagnier*, 142 F3d 791, 798 (5th Cir 1998), quoting *City of Canton,* 489 US at 390. The plaintiff must allege with specificity how the training program is defective in this regard to withstand a motion to dismiss. *Roberts v City of Shreveport,* 397 F3d 287, 293 (5th Cir 2005) (quotations omitted).

To the contrary, the allegations by Plaintiffs are wholly conclusory. They neither identify specific facts about the City's training protocols nor describe any deficiencies that pertain to the individual Defendants' duties. See *Snyder*, 142 F3d at 798; *Taylor*, 488 F Supp 3d at 535–36. Instead, they generally allege that the City "was required to train its jail personnel on the method and means of evaluating persons placed in custody to keep them safe

from physical or psychological injury, harm or death," with conclusory connection that the actions at issue here constitute "[f]ailing to properly train, supervise, discipline, transfer, monitor, counsel and otherwise control police officers." Dkt 53 at ¶¶ 4.11, 7.27. The Fifth Circuit is clear that it's insufficient to "present evidence of isolated violations and ascribe those violations to a failure to train." *Zarnow v City of Wichita Falls*, 614 F3d 161, 170 (5th Cir 2010), citing *Goodman v Harris County*, 571 F3d 388 (5th Cir 2009). In other words, a Plaintiff can't state a failure-to-train claim by merely pointing to a municipal policy and saying that it wasn't observed. See *Roberts v City of Shreveport*, 397 F3d 287, 293 (5th Cir 2005).

*As to deliberate indifference.* In the context of municipal liability, *deliberate indifference* is "a stringent standard of fault," one "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 US at 61, quoting *Board of County Commissioners*, 520 US at 409–10. "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 US at 61, citing *Board of County Commissioners*, 520 US at 407. To establish the deliberate indifference of a municipality, it is "ordinarily necessary" for a plaintiff to allege a pattern of similar constitutional violations by untrained employees. *Connick*, 563 US at 62, quoting *Board of County Commissioners*, 520 US at 407. A plaintiff must generally show that, given the duties assigned to specific officers or employees, "the need for more or different training is obvious, and the inadequacy is likely to result in the violation of constitutional rights." *City of Canton*, 489 US at 390.

Plaintiffs fail to allege any other similar violation, much less the pattern that is typically required to establish deliberate indifference in this context. They say only that the City acted at "a level of official policy, practice, and custom, with deliberate, callous, conscious and unreasonable indifference" in failing to train and supervise the individual Defendants. Dkt 53 at ¶ 7.27. That is wholly conclusory and deficient.

*As to causation.* Plaintiffs having failed to allege facts to establish the first two elements, they necessarily fail to allege facts showing that any inadequate training caused an underlying constitutional violation. See *Taylor*, 488 F Supp 3d at 536.

Plaintiffs fail to sufficiently plead their failure-to-train claim. It must be dismissed.

ii.   Ratification theory

The Supreme Court permits a ratification theory against a municipality to go forward in certain limited circumstances:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*City of St Louis v Praprotnik*, 485 US 112, 127 (1988) (emphasis in original).

On the pleadings in *Covington v City of Madisonville*, the Fifth Circuit found such theory sufficiently alleged to withstand motion to dismiss. 812 F Appx 219, 228–29 (5th Cir 2020, *per curiam*). It specified as follows:

> Ratification in this context requires that a policymaker knowingly approve a subordinate's actions and the improper basis for those actions. Otherwise, unless conduct is "manifestly indefensible," a policymaker's mistaken defense of a subordinate who is later found to have broken the law is not ratification chargeable to the municipality.

Id at 228, citing *Praprotnik*, 485 US at 127, *Beattie v Madison County School District*, 254 F3d 595, 603 n 9 (5th Cir 2001), and *Coon v Ledbetter*, 780 F2d 1158, 1161–62 (5th Cir 1986).

Inquiry in this regard requires "identification of officials or governmental bodies 'who speak with final policymaking

authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *Doe v Harris County Precinct Six Constable Sylvia Trevino*, 452 F Supp 3d 548, 559 (SD Tex 2020), quoting *Bolton v City of Dallas*, 541 F3d 545, 548 (5th Cir 2008). It isn't that "the specific identity of the policymaker" must be alleged in the complaint. *Groden v City of Dallas*, 826 F3d 280, 285 (5th Cir 2016), citing *Johnson v City of Shelby*, 574 US 10, 11 (2014, *per curiam*). But it must still "plead *facts* that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker." *Groden*, 826 F3d at 282 (emphasis in original).

Plaintiffs' don't allege specific facts that support an inference that any pertinent policymaker knew of unlawful actions and approved them. They instead simply attribute all action generally to the City. For example, they allege, "Defendant City of Houston, as acting at the level of official policy, practice, and custom, with deliberate, callous, conscious and unreasonable indifference to Decedent's constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein detailed . . . ." Dkt 53 at ¶ 7.27; see also id at ¶¶ 4.33, 8.1. Such allegations are wholly conclusory and deficient. Neither a putative policymaker nor any specific action taken by that person or entity is identified. But that is the requirement—the pleading of *facts* sufficient to show that a policymaker has actual knowledge of the improper basis for the subordinate's action and yet approves the action anyway. See *Beattie*, 254 F3d at 604; *Groden*, 826 F3d at 282; see also *Taylor*, 488 F Supp 3d at 545.

Beyond this, none of the conduct here can be said to be *manifestly indefensible* in the sense that a policymaker (if named) reviewing it would have notice that Stephen's constitutional rights were violated. As determined above, the individual Defendants are entitled to qualified immunity with respect to the underlying conduct. This necessarily means that the conduct doesn't show "an obvious violation of clearly established law." *Young v Board of Supervisors of Humphreys County*, 927 F3d 898, 903 (5th Cir 2019) (quotation omitted).

Plaintiffs fail to sufficiently plead their ratification claim. It must be dismissed.

### d.   Request for discovery

Plaintiffs suggest that dismissal is "premature" because there hasn't been "adequate time" for discovery. They seek further information on the events that occurred on the night at issue, including whether any jail staff was "reprimanded" and details on the City's training policies. Dkt 56 at 10–11; Dkt 57 at 11–12. But Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 US at 678–79. As such, a plaintiff isn't entitled at the pleading stage to discovery "broadly to seek information that might impeach the defendants' version of events." *Hutcheson v Dallas County*, 994 F3d 477, 481 (5th Cir 2021), citing *Backe*, 691 F3d at 648.

As to the claims asserted against the individual Defendants, the Fifth Circuit explains that prevention of unnecessary discovery "is *precisely* the point of the qualified immunity doctrine: to protect public officials from expansive, intrusive discovery until and unless the requisite showing overcoming immunity is made." *Backe*, 691 F3d at 648 (emphasis in original); see also *Hutcheson*, 994 F3d at 481; *Khansari v City of Houston*, 14 F Supp 3d 842, 861 (SD Tex 2014). As to the claims asserted against the City, discovery is inappropriate where a plaintiff pleads only a "boilerplate recitation of the grounds for municipal liability." *Harkless v Brazoria County*, 2016 WL 1702595, *5 (SD Tex), quoting *Thomas v City of Galveston*, 800 F Supp 2d 826, 844–45 (SD Tex 2011).

Even so, certain discovery was permitted. The original complaint was filed in February 2017. The docket reflects discovery that took place when this matter was assigned to Judge Lynn Hughes. See Dkts 10, 20, 29. This included production of the ten video segments that appear to account for the entirety of Stephen's time within the HCJ, along with related files. See Dkt 10 (ordering production of all logs, incident reports, pictures, and video of Stephen at HCJ).

The matter was then reassigned to this Court in October 2019. Dkt 47. At a status conference, Plaintiffs received leave to file a further amended complaint to meet then-pending

motions to dismiss. The parties were permitted to exchange interrogatories and requests for admissions, while being directed "to confer as to further document production." They were admonished to initiate any dispute over document production by way of discovery letter. See Minute Entry of 02/25/2020. None was ever submitted.

Given the targeted discovery that was allowed and the related failure to timely request other discovery in the manner directed, the request for further discovery is denied.

e. Potential for repleading

A district court "should freely give leave [to amend] when justice so requires." FRCP 15(a)(2). The Fifth Circuit holds that this evinces a bias in favor of granting leave to amend. See *Dussouy v Gulf Coast Investment Corp*, 660 F2d 594, 597(5th Cir 1981); *Carroll v Fort James Corp*, 470 F3d 1171, 1175 (5th Cir 2006). But whether to grant such leave is within the sound discretion of the district court. *Pervasive Software Inc v Lexware GmbH & Co KG*, 688 F3d 214, 232 (5th Cir 2012), quoting *Wimm v Jack Eckerd Corp*, 3 F3d 137, 139 (5th Cir 1993). It may be denied "when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v Chapman*, 969 F3d 238, 248 (5th Cir 2020), citing *Smith v EMC Corp*, 393 F3d 590, 595 (5th Cir 2004).

The operative pleading here is Plaintiffs' fourth amended complaint. Dkt 53. Defendants also moved to dismiss the third amended complaint on the same arguments sponsored now. See Dkts 31, 35, 36. Plaintiffs received leave to meet those arguments with "a further and final amended complaint." Minute Entry of 02/25/2020. Their fourth amended complaint fails to do so.

Further leave to amend is inappropriate. Plaintiffs' claims will be dismissed with prejudice.

5.   Conclusion

The motion by the individual Defendants to dismiss the claims brought by Plaintiffs is GRANTED. Dkt 54.

The motion by the City of Houston to dismiss the claims brought by Plaintiffs is GRANTED. Dkt 55.

All claims in this action are DISMISSED WITH PREJUDICE.

SO ORDERED.

Signed on June 15, 2021, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

29